UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

KEVIN C. MOORE,                          )
                                         )
          Plaintiff,                     )
                                         )
     vs.                                 )          Case No. 4:12CV539 CDP
                                         )
CAROLYN W. COLVIN,[1]                    )
Commissioner of Social Security,         )
                                         )
          Defendant.                     )

## MEMORANDUM AND ORDER

This is an action for judicial review of the Commissioner's decision denying
Kevin Moore's application for supplemental security income (SSI) benefits based
on disability under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381, et
seq.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial
review of a final decision of the Commissioner under Title XVI.  Moore claims he
is disabled because of pain in his back and right leg.  Moore alleges disability
beginning May 15, 2009.  Because I find that the decision denying benefits was
supported by substantial evidence, I will affirm the decision of the Commissioner.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February
14, 2013.  As such, she should be substituted for Michael J. Astrue as the defendant in this suit.
Fed. R. Civ. P. 25(d).

## Procedural History

Moore filed his application for disability benefits on June 17, 2009.  His application was denied initially, and on February 23, 2011, following a hearing, an ALJ issued a decision that Moore was not disabled.  The Appeals Council of the Social Security Administration (SSA) denied his request for review on January 27, 2012.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the Administrative Law Judge

### Application for Benefits

In his Application for Disability Benefits completed on July 9, 2009, Moore stated that he lived with his ex-wife and three children.  He described his daily activities as getting his five and eight year old children ready for school, then washing dishes and doing laundry until lunchtime.  He feeds his four-year old child, then makes a small meal for himself and either reads or watches television until it is time to start cooking dinner at 2:30 p.m.  At 3:30 p.m., he meets his children at the bus stop, picks up his mail, then goes home to finish cooking dinner.  After dinner, he helps his children with their homework, does dishes, and then sometimes reads a book.  Moore stated that his children are taken care of "by me alone" because his ex-wife "just lives in my home but she is no help

- 2 -

whatsoever, financially, physically, or anything with the kids . . . ."  Moore said that he has custody of his children and really does not want his ex-wife to remain in his house "but that's the way things are . . . ."  Moore has no difficulties with personal care or grooming, and he does all the cooking for the house.  He cuts the grass with a riding mower and does the laundry with limited assistance from his oldest child.  Moore drives a car, grocery shops about twice a week, and attends church regularly.  Moore claims that he has difficulty lifting, squatting, bending, standing, reaching, and walking.   He stated that he is in pain and sometimes has difficulty sleeping as a result, even while on medication.

<u>Medical Records</u>

In March of 2005, Moore went to see his primary care physician, Armela Agasino, M.D., complaining of back pain after injuring his back at work. Persistent back pain was also noted by Dr. Agasino on the following treatment dates: April 8, 2005; August 25, 2005; March 7, 2006; March 5, 2007; May 29, 2007; and April 20, 2009.

On April 12, 2005, Moore had an MRI of his lumbar spine.  The results showed degenerative disc disease at L4-5 as manifested by desiccation and posterior protrusion of the disc in the right paramedian location, causing some indentation upon the anterior thecal sac.

Moore was evaluated by a consultative examiner, Bobby Enkvetchakul, M.D., on July 24, 2009.  Moore reported back pain beginning in 2005, but said he previously refused surgery.  He admitted that he had no testing since his previous disability evaluation with Dr. Enkvetchakul in 2008.  Dr. Enkvetchakul observed Moore was obese but he could get on and off the exam table without assistance. Moore "ambulated with a normal appearing stride" and could "rise up on his toes and rock back on his heels."  Moore performed a full squat and touched his toes without difficulty.  He had some tenderness in his spine but showed an "active range of motion."  Moore had "some mild limitation in right side bending secondary to complaints of pain, but he had full left side bending."  Moore had a "full range of motion" in his cervical spine, and no swelling, erythema, or focal atrophy of his upper extremities.  He also demonstrated a full range of motion in his shoulders, elbows, wrists, and fingers, with 5/5 grip strength.  Although Hoffman testing was positive on the right upper extremity, Dr. Enkvetchakul decided it was not significant because Moore had no other correlating symptoms. Dr. Enkvetchakul diagnosed back and right lower extremity pain, but he questioned "the veracity of those pain complaints."  Dr. Enkvetchakul could not "find any specific objective evidence that correlates with symptoms to suggest significant work restrictions."  Therefore, he concluded that Moore could sit

during a normal eight-hour workday, with normal breaks, and no restrictions on

standing, walking, carrying, or reaching, although his medication might limit his

ability to engage in "safety sensitive duties."

Dr. Agasino completed an impairment questionnaire at Moore's request on

August 12, 2009.  She reported that she saw Moore approximately every two

months for back pain from March 2005 through July 2009.  Dr. Agasino

diagnosed Moore with degenerative disc disease at L4/L5, desiccation of the disc,

and posterior protrusion.  She reported that Moore had severe low back pain from

the L4/L5 region radiating down the hips and legs with weakness and numbness

on his right leg.  Dr. Agasino stated that Moore's pain was a ten on a ten-point

scale and his fatigue was an eight.  Dr. Agasino opined that Moore could sit, stand,

or walk for one hour during an eight hour day.  She found that Moore could

occasionally lift and carry up to ten pounds, and that he had significant limitations

in performing repetitive reaching, handling, fine manipulations of the fingers and

hands, or lifting.  Dr. Agasino believed that Moore would have difficulty keeping

his neck in a constant position, and that he could not perform a full time

competitive job that requires activity on a sustained basis.  According to Dr.

Agasino, Moore's pain would frequently interfere with his attention and

concentration and produce "good days" and "bad days."  She estimated that Moore

would likely miss work about two to three times a month because of back pain, and that he would need to avoid wetness, extreme temperatures, heights, pulling, pushing, kneeling, bending, and stooping.  Dr. Agasino concluded that Moore "can't work."

Moore saw Dr. Agasino on September 21, 2009 for lower back pain. Moore complained of severe pain and muscle spasms and stated that he was unable to bend, sleep, stand up for long periods of time, or move fast.  Moore told Dr. Agasino that pain medication did not relieve his pain.  Dr. Agasino diagnosed Moore with right paramedian protrusion of L4 and L5 with desiccation and posterior protrusion of the disc with some indentation upon the anterior thecal sac. Under the heading "Medical Basis for Diagnosis," Dr. Agasino wrote the following:

> When the patient came to the office he was complaining of persistent low back pain with numbness and weakness of the right lower extremity.  The treatment that was given to him was Tylenol 3 every 4-5 hours as needed for pain, Ultracet one three times a day for pain, Soma 350 mg. three times a day as a muscle relaxant.  I also gave him lisinopril 20 mg. once a day.

Dr. Agasino noted that Moore came every 3-4 months and that he "cannot work, he cannot bend, he cannot lift, he cannot walk for long time and he cannot stand up for long time."  Dr. Agasino rated Moore's prognosis for recovery as "very poor, even up to the present time."

- 6 -

On June 15, 2010, Moore was seen by a nurse practitioner for dysuria, constipation, back pain, abdominal discomfort, and nausea.  Moore described his back pain as burning in the lower lumbar region and denied any relieving factors. The examining nurse observed no curvature in Moore's spine and stated that his extremities were normal.  A month later, she observed that Moore had no bone or joint symptoms.

Moore did not see Dr. Agasino again for his back pain until August 25, 2010.  Dr. Agasino wrote that Moore came to see her for back pain, to refill his medication, and "for referral for disability."  Moore told Dr. Agasino that his back pain had been "horrible and unbearable" for the past 2-3 months and that it was aggravated by walking, sitting, lying down, and lifting, but Dr. Agasino observed no acute distress.  Moore also complained of pain in his right hip radiating down his right leg.  She observed tenderness in the lumbrosacral area and right hip and assessed lower back pain and muscle spasm.

On August 31, 2010, Moore had radiographs of his spine which revealed "mild radiographic evidence of degenerative disc disease in the lower lumbar spine." A slight disc space narrowing was observed at L4-L5 and L5-S1, suggesting underlying disc disease, but the disc spaces were preserved, and there were no substantial degenerative facet changes or pars defects.

Moore started physical therapy with Janis Wylie, P.T., on September 7, 2010.  His primary complaint was lower back pain.  Moore rated his pain on scale ranging from seven out of ten to three out of ten while on pain medication.  Moore described an "active lifestyle" to Wylie, but told her he had been unable to do physical labor or work since 2005.  Wylie noted full right hip flexion with tight lateral movements with decreased adduction and pelvic instability when his right leg was lowered.  Wylie stated that Moore tolerated treatment "fair" and had "pain with SIJ's movement."  She recommended exercise and stretching.

Moore returned to physical therapy on September 10, 2010.  He claimed that he would not be walking "if not for pain meds," but stated that he did not want to be taking them.  Four days later, Moore admitted he felt better since his last visit and stated he had not taken his pain medication for a couple of days.

Moore saw Dr. Agasino again on September 13, 2010, for persistent back pain.  She noted that he had been in physical therapy for two weeks and needed muscle relaxants.  Moore told Dr. Agasino that his pain had decreased since he started physical therapy so he cut back on his pain medication.  Physical examination revealed persistent pain on the lower back radiating to both sides of the hips.  Dr. Agasino refilled his prescription for muscle relaxants.

On October 14, 2010, Moore went to the hospital after he fell out of a golf

cart.  He was ambulatory when he arrived and stated that he just wanted to make sure nothing was broken.  Moore stated that his tailbone was painful to sit on.  An x-ray of his spine revealed no acute fracture or abnormality.  The interpreting physician noted that Moore's joints were normally aligned.

On October 20, 2010, Moore saw Mark Geronimo, M.D., for a follow-up visit after his fall.  He described his back pain as moderate to severe and persistent.  Moore stated that his symptoms were aggravated by changing positions and relieved by pain medication.  Examination revealed muscle spasms and tenderness in his back.  Straight leg testing was negative.  Dr. Geronimo observed that Moore was obese and had normal balance, reflexes, and gait.  He assessed chronic low back pain and recommended physical therapy, a heating pad, and medication for pain control.

<u>Testimony</u>

The ALJ held a hearing on Moore's application for benefits on December 10, 2010.  Moore appeared for the hearing, testified, and was represented by counsel.  At the time of the hearing, Moore was 34 years old and weighed around 300 pounds at about five feet ten inches tall.  He completed the ninth grade. Moore testified that he was injured in March of 2005 after lifting a 100 pound concrete septic tank riser off the back of a truck.  Moore said he can only sit for

about 30 minutes before he has to stand up or change positions, and he is

"constantly trying to get comfortable."  Moore can stand or move around for about

20 minutes before needing to sit or lie down.  The weather worsens his condition,

and he sometimes stays in bed all day for up to five days a month.  At the hearing,

Moore testified that his wife "does just about like 90 percent of everything, which

is wonderful."  Moore stated that he does not take showers because he cannot

stand for that length of time; instead, he takes baths.  He uses heating pads and

back massagers regularly.  Moore takes Flexeril, a muscle relaxer, twice a day and

500 mg. of Vicodin three times daily for pain.  He changed chairs during the

hearing.

Ollie Ralston, M.D., a medical expert and orthopedic surgeon, reviewed

Moore's medical records and testified at the hearing.  Dr. Ralston diagnosed

Moore with a right herniated nucleus pulposus of L4-L5, mild to moderate, with

chronic low back pain, right lower extremity radiculitis, and hypertension.  Based

on Moore's medical records, Dr. Ralston opined that Moore could perform light-

duty work, including lifting twenty pounds occasionally and ten pounds

frequently, and standing, walking, and sitting for six hours.  Dr. Ralston believed

that Moore could balance and kneel frequently, and climb, crawl, crouch, and

stoop occasionally; however, overhead reaching should be limited, and Moore

should never be around unprotected heights, ropes, ladders, or heavy machinery. Dr. Ralston found that with a sit/stand option "on an hourly basis with a change of position for about five minutes," then Moore could stand and walk in combination for six out of eight hours in a workday, or sit six out of eight hours.  Dr. Ralston testified that he disagreed with Dr. Agasino's assessment because his was based "primarily on the objective findings, with some consideration for subjective complaints," whereas her assessment "is going primarily all on subjective complaints . . . ."

A vocational expert also testified as follows in response to a hypothetical posed by the ALJ:

> Q: Let's do, as our first hypothetical, let's start a person – as our made-up person, who will be a younger individual, off with a full light exertional capacity, and then we're going to do some reduction. Let's show the person occasionally could stoop, crouch, crawl and climb stairs.  The person frequently, for this hypothetical, could balance, kneel, and perform overhead reaching.  However, the person should avoid concentrated exposure to unprotected heights, to ropes or ladders, so that would put that climbing there, let's say never on climbing ropes and ladders.

> A: Okay.

> Q: That would clear up – this person should also avoid, in addition to the unprotected heights, heavy moving machinery.  The person should be able to change position, from a sit/stand option, after one hour, for about five minutes change position, but do that at the workstation, whether or not [INAUDIBLE].  Just under that hypothetical, could such a person perform the past work that Mr.

- 11 -

Moore has done?

A: No, Your Honor.

Q: Would there be other work for the made-up person just under this hypothetical?

A: One job title would be ticket taker . . . Merchandise marker . . . Labeler/marker . . . .

Q: If we change the hypothetical, and now let's reduce the person to lifting would be at ten pounds occasionally and less than ten pounds frequently.  Let's put our person at stand and walk would be two hours total out of an eight-hour day.  We'll keep sitting at six out of the eight hours.  And all of the other items we had with the last one will remain the same, the climbing and . . . stooping and all that, and then the sit/stand option.  Under that hypothetical only, would those jobs remain?

A: No, the three light jobs that I cited will not be available at that point.

Q: Would there be other work for the made-up person?

A: One job title is press clippings cutter and paster . . . film touch-up inspector . . . microfilm document preparer . . . .

Q: If we change the hypothetical such that our made-up person would need additional or prolonged breaks, will that preclude work?

A: Yes, it will.

Q: If a person will have absences of at least five days per month, will that preclude work?

A: Yes, it will.

- 12 -

## **Legal Standard**

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or because the court would have decided the case differently.  Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole and to consider:

> (1) the credibility findings made by the Administrative Law Judge;
>
> (2) the education, background, work history, and age of the claimant;
>
> (3) the medical evidence from treating and consulting physicians;
>
> (4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
>
> (5) any corroboration by third parties of the plaintiff's impairments; and
>
> (6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a).  In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity.  If the claimant is engaging in substantial gainful

- 14 -

activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work.  If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, the Commissioner declares the claimant disabled.  § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  Basinger v. Heckler, 725 F.2d

1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's

subjective complaints when they are inconsistent with the record as a whole.  See

e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  In considering the

subjective complaints, the ALJ is required to consider the factors set out by

Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties
> and treating and examining physicians relating to such matters
> as: (1) the claimant's daily activities; (2) the duration,
> frequency, and intensity of the pain; (3) precipitating and
> aggravating factors; (4) dosage, effectiveness and side effects
> of medication; and (5) functional restrictions.

Id. at 1322.  When an ALJ explicitly finds that the claimant's testimony is not

credible and gives good reasons for the findings, the court will usually defer to the

ALJ's finding.  Casey v. Astrue 503 F.3d 687, 696 (8th Cir. 2007).  However, the

ALJ retains the responsibility of developing a full and fair record in the non-

adversarial administrative proceeding.  Hildebrand v. Barnhart, 302 F.3d 836, 838

(8th Cir. 2002).

### The ALJ's Findings

The ALJ issued her decision that Moore was not disabled on February 23,

2011.  She found that Moore had the severe impairments of degenerative disc

disease and osteoarthritis.  In reaching her conclusion that Moore does not have

an impairment or combination of impairments that either meet or medically equal

one of the listings, the ALJ reviewed the medical evidence of record, including

Moore's consultative examination with Dr. Enkvetchakul, Dr. Agasino's medical

records and impairment questionnaire, as well as his medical records from the

hospital after his fall from a golf cart.  The ALJ found that Moore retained the

residual functional capacity to perform light work, except for an inability to stoop,

crouch, crawl, or climb stairs more than occasionally, to balance, kneel, or reach

overhead more than frequently, ever to climb ropes or ladders, to sit or stand

without the opportunity to change positions at the work station, and to have a

concentrated exposure to unprotected heights and heaving moving machinery.  In

fashioning Moore's RFC, the ALJ determined that his impairments could be

expected to produce some of his alleged symptoms; however, she concluded that

Moore's statements concerning the intensity, persistence, and limiting effects of

those symptoms were not entirely credible to the extent they were inconsistent

with his RFC.  The ALJ gave little weight to Dr. Agasino's opinions because there

were no medical or clinical findings, laboratory reports, or documented

observations in the record to support her opinion.  Instead, she credited Dr.

Ralston's opinion that Moore's physical examinations did not support his claimed

limitations.  She noted that Moore's recent injury was due to a fall from a golf

cart, and that his most recent x-ray revealed only mild degenerative changes.  In

addition, Moore's doctors recommended only conservative treatment, such as

physical therapy and medications, since surgery was allegedly rejected by Moore

in 2005.  The ALJ held that "[t]he record indicates that the claimant's limitations

do not preclude him from all work or from participation in an active lifestyle as

self-described by the claimant to his doctor . . . ."  After finding that Moore was

unable to perform his past relevant work, the ALJ relied on the vocational expert's

testimony and concluded that Moore was not disabled.

## Discussion

Moore first argues that the ALJ erred in her consideration of Dr. Agasino's

opinion.  "It is the ALJ's function to resolve conflicts among the various treating

and examining physicians."  Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)

(internal quotation marks and citation omitted).  The opinions and findings of the

plaintiff's treating physician are entitled to "controlling weight" if that opinion is

"'well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in [the]

record.'"  Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20

C.F.R. § 404.1527(d)(2)).  However, the opinion of the treating physician should

be given great weight only if it is based on sufficient medical data.  Leckenby v.

Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (holding that a treating physician's

opinion does not automatically control or obviate need to evaluate record as whole
and upholding the ALJ's decision to discount the treating physician's
medical-source statement where limitations were never mentioned in numerous
treatment records or supported by any explanation); Chamberlain v. Shalala, 47
F.3d 1489, 1494 (8th Cir. 1995) (holding that opinions of treating doctors are not
conclusive in determining disability status and must be supported by medically
acceptable clinical or diagnostic data) (internal quotation marks and citation
omitted); Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (holding that
where a treating physician's notes are inconsistent with his or her RFC
assessment, controlling weight is not given to the RFC assessment).  "Although a
treating physician's opinion is entitled to great weight, it does not automatically
control or obviate the need to evaluate the record as a whole."  Hogan v. Apfel,
239 F.3d 958, 961 (8th Cir. 2001).

An ALJ may "discount or even disregard the opinion of a treating physician
where other medical assessments are supported by better or more thorough
medical evidence, or where a treating physician renders inconsistent opinions that
undermine the credibility of such opinions." Prosch, 201 F.3d at 1013; Cox v.
Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a
treating doctor's opinion limited weight if it is inconsistent with the record).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, *2 (S.S.A. July 2, 1996). SSR 96-2p clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.")). "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" Tindell v. Barnhart, 444 F.3d 1002, 1005 (8th Cir. 2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted)). An ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence. Kirby

v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) (citing Vandenboom, 421 F.3d at

749).

Dr. Agasino opined that Moore was unable to work.  In evaluating Dr.

Agasino's opinion, the ALJ held:

> The Administrative Law Judge gives little weight to Dr. Agasino's opinions
> concerning the claimant's ability to work.  There are no medical or clinical
> findings, no laboratory reports or documented observations in the record to
> support the doctor's opinion.  The claimant's recent injury was a result of
> falling out of a golf cart.  The most recent x-ray revealed mild degenerative
> changes.  Surgery has not been recommended since the claimant reported he
> was told to consider it in 2005.  His doctors have provided conservative
> treatment such as physical therapy and medications.  The record indicates
> that the claimant's limitations do not preclude him from all work or from
> participation in an active lifestyle as self-described by the claimant to his
> doctor at the Clinic.

Here, the ALJ recognized Dr. Agasino's opinion, but then properly assigned it

little weight as it was inconsistent with the objective evidence of record and not

supported by clinical and laboratory findings.  "A medical source opinion that an

applicant is 'disabled' or 'unable to work,' however, involves an issue reserved for

the Commissioner and therefore is not the type of 'medical opinion' to which the

Commissioner gives controlling weight."  Ellis v. Barnhart, 392 F.3d 988, 994

(8th Cir. 2005).  Therefore, it was not error for the ALJ to disregard Dr. Agasino's

statements that Moore was unable to work.  Moreover, Dr. Agasino did not

provide any data to support her opinions, and her statement that she saw Moore

- 21 -

every few months is not supported by her records.  In fact, the medical records

reveal that Moore did not seek treatment from Dr. Agasino for nearly a year

between September 21, 2009 and August 25, 2010.[2]   As noted by Dr. Ralston in

his testimony and the ALJ in her decision, Dr. Agasino's treatment notes were

limited and basically showed subjective complaints but with normal gait, full

range of motion, normal back inspection, non-tender extremities, and normal

affect and mood.  Dr. Enkvetchakul's examination on July 24, 2009, was

essentially within normal limits.  Dr. Agasino did not include any test or grade in

her opinions to indicate the loss of strength and motion range.  Moreover, Dr.

Agasino's course of treatment, which consisted primarily of medication

management and physical thearapy, is inconsistent with the limitations she

claimed.  Dr. Agasino never referred Moore to a specialist for consultation about

his back pain.  Although Dr. Agasino claimed that she based her opinion on

Moore's MRI readings, xrays, and consultative reports, this evidence does not

support the limitations found by Dr. Agasino in her impairment questionnaire.  Dr.

Agasino found that Moore was significantly limited at repetitive reaching,

handling, or using his fingers, yet Dr. Enkvetchakul observed that Moore had full

---

[2]Although Moore saw a nurse on June 15, 2010, for dysuria, constipation, back pain, abdominal discomfort, and nausea, the examining nurse observed no curvature in Moore's spine and stated that his extremities were normal.  A month later, she observed that Moore had no bone or joint symptoms.

range of motion in his wrists and fingers.  Similarly, while Dr. Agasino opined

that Moore would be restricted in grasping with both hands, Dr. Enkvetchakul

found that he had 5/5 grip strength.  Dr. Agasino stated that Moore was unable to

push, pull, kneel, bend, or stoop, but Dr. Enkvetchakul observed Moore perform a

full squat and touch his toes without difficulty, get on and off the exam table

without assistance, ambulate with a normal appearing stride, and rise up on his

toes and rock back on his heels.  Moreover, Moore showed an active range of

motion, with only mild limitation in right side bending, full left side bending, and

a full range of motion in his cervical spine, without swelling, erythema, or focal

atrophy of his upper extremities.  The MRI results and x-rays, the last of which

was taken only two months before the hearing, showed only mild evidence of a

back impairment.  Dr. Geronimo likewise observed that Moore had normal

balance, reflexes, and gait after Moore's fall from a golf cart, and only

recommended physical therapy, a heating pad, and medication for pain control.

The ALJ properly discounted the credibility of Dr. Agasino's opinions

because they did not match the objective medical evidence of record or the

testimony of the consultative expert, Dr. Ralston.  Here, the ALJ credited Dr.

Ralston's testimony because it was consistent with the other objective medical

evidence of record.  Dr. Ralston explained that his opinions differed from Dr.

Agasino's opinions because his assessment was based "primarily on the objective findings, with some consideration for subjective complaints," whereas her assessment "is going primarily all on subjective complaints . . . ."  After reviewing Moore's medical file, Dr. Ralston testified that Moore could sit, stand, or walk for six hours in an eight-hour workday.  This finding was supported by Moore's other examining physicians.  Dr. Geronimo, a treating physician, observed that Moore had negative straight leg raising test results and normal gait, balance and reflexes.  Dr. Enkvetchakul, a consultative physician who examined Moore twice, reported that Moore ambulated with a normal appearing stride and could sit during a normal eight-hour workday, with normal breaks and no restrictions on standing or walking.  Dr. Ralston restricted Moore to occasional climbing, crawling, crouching, and stooping, which was consistent with Dr. Enkvetchakul's findings that Moore could perform a full squat, climb on and off the exam table, and touch his toes without difficulty.  Dr. Envetchakul also reported that Moore had some mild limitation in right side bending, but full left side bending, and a full range of motion in his cervical spine.  In fact, he found no specific objective evidence that correlated with Moore's symptoms and concluded that Moore needed no restrictions on his activities except for those imposed by his medication.

Moore suggests that the ALJ should have re-contacted Dr. Agasino for

additional information or clarification before discounting her opinion.  The ALJ

does have a duty to fully develop the record, which may include seeking

clarification from treating physicians if a "crucial issue is undeveloped or

underdeveloped."  See Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006).

Here, however, Moore has provided no evidence of an undeveloped issue.

Moreover, "once an ALJ concludes, based on sufficient evidence, that the treating

doctor's opinion is 'inherently contradictory or unreliable,' he or she is not

generally required to seek more information from that doctor." Samons v. Astrue,

497 F.3d 813, 819 (8th Cir. 2007) (internal citation omitted).  Given the lack of

data supporting Dr. Agasino's opinions and the discrepancies between her

opinions and her recommended course of treatment, the ALJ was under no duty to

contact her, and it was proper for the ALJ to rely on other, more credible evidence

in the record regarding Moore's impairments.  See id. (no error in ALJ's failure to

contact treating physician for additional information where ALJ properly decided

not to give substantial weight to opinion).  Credibility determinations, when

adequately explained and supported, are for the ALJ to make.  Lowe v. Apfel, 226

F.3d 969, 972 (8th Cir. 2000).  Because the ALJ gave sound reasons for

discounting Dr. Agasino's opinions, which were supported by the record, I will

defer to her judgment.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir 2001).  The

ALJ did not err in discounting Dr. Agasino's opinions and crediting Dr. Ralston's testimony, which was consistent with the other objective medical evidence of record.

Next, Moore contends that the ALJ failed to properly articulate the sit/stand option in her RFC determination.  RFC is defined as "what [the claimant] can still do" despite his "physical or mental limitations."  20 C.F.R. § 404.1545(a).  "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001).  The Eighth Circuit has noted the ALJ must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations. McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

Here, the ALJ concluded that Moore had the RFC to perform light work that provided him an opportunity to change positions from sitting to standing at the workstation.  Although she did not specifically articulate the frequency and length of the changes in the RFC formulation, the record is clear that she considered a sit/stand option for about five minutes after about one hour at the

workstation.  This is the hypothetical the ALJ posed to the VE during the hearing and upon which she based the RFC, and it is also consistent with Dr. Ralston's opinion that Moore "should be afforded a sit/stand option . . . on an hourly basis with a change of position for about five minutes."   The VE testified that, with this five minute change of position limitation, Moore could work as a ticket taker, merchandise marker, and labeler/marker.  These are the same jobs the ALJ found Moore could perform given his age, education, work experience, and RFC.  Thus, it is clear that the ALJ considered a five-minute sit/stand option when formulating Moore's RFC.  The ALJ's hypothetical to the VE and Dr. Ralston's testimony resolve any alleged ambiguity in the RFC, and substantial evidence in the record as a whole supports the ALJ's RFC determination.

Moore also argues that the ALJ erred in failing to consider his obesity when formulating his RFC.  According to Moore, the ALJ should have considered the combined effects of his obesity with his severe impairments.[3]  In making the RFC determination, the ALJ properly considered Moore's medically determinable impairments and the extent to which the symptoms were consistent with the objective medical evidence, the medical evidence of record, and Moore's statements about his daily activities and subjective complaints.  The ALJ discussed

---

[3]Moore did not allege or argue obesity as a severe impairment.

the medical evidence, which included Moore's diagnosis of obesity.  "[W]hen an

ALJ references the claimant's obesity during the claim evaluation process, such

review may be sufficient to avoid reversal."  Heino v. Astrue, 578 F.3d 873, 881

(8th Cir. 2009).  Here, the ALJ noted that "examination showed  [Moore] was five

feet ten inches tall and weighed two hundred and ninety-nine pounds," and "[h]e

was obese."  The ALJ then proceeded to discuss the medical evidence of record

which demonstrated that Moore's obesity had no effect on his functional abilities.

Dr. Enkvetchakul observed Moore was obese but could get on and off the exam

table without assistance.  Moore "ambulated with a normal appearing stride" and

could "rise up on his toes and rock back on his heels."  Moore performed a full

squat and touched his toes without difficulty.  He had an "active range of motion,"

including full left side bending, a "full range of motion" in his cervical spine, and

no swelling, erythema, or focal atrophy of his upper extremities.  He also

demonstrated a full range of motion in his shoulders, elbows, wrists, and fingers.

Moore's obesity was also noted by Dr. Geronimo, who observed that Moore

nevertheless had normal balance, reflexes, and gait.  No doctor, including Dr.

Agasino, ever opined that Moore had any obesity-related limitations, and Moore

described his lifestyle as active and not limited in any respect by his obesity.  The

ALJ properly evaluated Moore's obesity when formulating his RFC, and "[i]n

light of the evidence of record, the fact that the ALJ's decision does not discuss

obesity as an impairment is not fatal."  Forte v. Barnhart, 377 F.3d 892, 896-97

(8th Cir. 2004) (internal quotation marks and citation omitted).  Because Moore

presents no evidence that his obesity limited him more than the RFC provided,

substantial evidence on the record as a whole supports the ALJ's decision.  See

McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly

limited his RFC determination to only the impairments and limitations he found to

be credible based on his evaluation of the entire record.").

Finally, Moore contends that the ALJ improperly determined his credibility.

"The credibility of a claimant's subjective testimony is primarily for the ALJ to

decide, not the courts."  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007)

(internal quotation marks and citation omitted).  While the ALJ must make express

credibility determinations, she need not explicitly discuss each Polaski factor.

Eichelberger v. Barnhart, 390 F.3d 584, 590 (8th Cir. 2004).  Here, although the

ALJ believed that Moore experienced some pain and other symptoms from his

impairments, she did not fully credit his statements about the intensity, persistence

and limiting effects of those claimed symptoms.  In reaching this conclusion, the

ALJ reviewed Moore's daily activities, which were inconsistent with his

allegations.  Although Moore testified that his wife performed most of the

- 29 -

household chores, in his function report Moore admitted that she was "no help

whatsoever" around the house or in caring for their three children.  He said he

prepared all the meals, including spending at least one hour daily cooking dinner,

did laundry, washed dishes, helped his children with homework, mowed the grass

with a riding mower, regularly shopped by himself, and went to church.  He also

fell out of a golf cart two months before his hearing and described his lifestyle as

"active" to his physical therapist in September of 2010.  Moore's daily activities

are not consistent with his testimony that he could only stand for 25 minutes and

sit for 30 minutes.

The ALJ also discussed Moore's conservative treatment for his back pain,

which is an appropriate factor to consider when evaluating a claimant's credibility.

See Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005) (ALJ appropriately

discredited claimant's allegations of disabling pain by relying, in part, on

claimant's lack of treatment).  Moore stated that he injured his back in 2005, yet

he admitted to Dr. Enkvetchakul in 2009 that he had only treated his back pain

with medication up to that point.  Moore testified that he refused surgery in 2005,

and the medical records did not reveal any surgery recommendations.  Moore was

primarily treated with medication and a heating pad, and he admitted that he felt

better and had stopped taking his pain medication four days after beginning

physical therapy.  Finally, Moore had almost a year-long gap in treatment for his back between September 2009 and August 2010.  Moore's treatment history is not consistent with Moore's allegations regarding the severity of his back pain.

The ALJ found that the objective evidence in the record was not consistent with Moore's allegations regarding the severity of his back pain.  Although Moore testified that he was sometimes forced to spend five days per month in bed, Dr. Enkvetchakul found no specific objective evidence that correlated with Moore's symptoms and concluded that Moore needed no restrictions on his activities except for those imposed by his medication.  Dr. Geronimo also observed that Moore had normal balance and gait, and Moore's x-rays showed only mild evidence of degenerative disc disease in his lower spine, with the rest of his back appearing normal.  The objective medical evidence does not support Moore's allegations regarding the severity of his pain.

Finally, the ALJ noted that Dr. Enkvetchakul questioned "the veracity of [Moore's] pain complaints"  because he could not "find any specific objective evidence that correlates with symptoms to suggest significant work restrictions."  Moore also saw Dr. Agasino in August 2010 "for referral for disability."  An ALJ may properly discount a claimant's subjective complaints of pain based on indications of symptom exaggeration, and the ALJ was entitled to draw

conclusions about Moore's credibility based on this observation.  See Baker v.
Barnhart, 457 F.3d 882, 893 (8th Cir. 2006); see also Shannon v. Chater, 54 F.3d
484, 486 (8th Cir. 1995) (ALJ properly discounted claimant's subjective
complaints of pain where "encounters with doctors appear to be linked primarily
to his quest to obtain benefits, rather than to obtain medical treatment.").  Here, the
ALJ's credibility determinations are well-supported by the inconsistencies in the
record.  See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  As a result, the
ALJ did not err in evaluating Moore's credibility.

Because I find that substantial evidence as a whole supports the ALJ's
decision to deny benefits because Moore is not disabled, I will affirm the decision
of the Commissioner.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner
denying benefits is affirmed.

A separate judgment in accord with this Memorandum and Order is entered
this date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of June, 2013.